# UNITED STATES DISTRICT COURT
# DISTRICT OF IDAHO

| | |
|---|---|
| WILLIAM FLETCHER,<br><br>    Plaintiff,<br><br>vs.<br><br>DEPUTY MARQUARDT<br><br>    Defendant. | Case No.: 1:15-CV-00029-REB<br><br>**MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**(Docket No. 64)** |

Now pending before the Court is Defendant's Motion for Summary Judgment (Docket No. 64). Having carefully considered the record and otherwise being fully advised, the undersigned enters the following Memorandum Decision and Order:

## I. PROCEDURAL BACKGROUND

Plaintiff William Fletcher is a prisoner proceeding pro se and in forma pauperis in this civil rights action. This Court previously reviewed Plaintiff's Complaint pursuant to 28 U.S.C. §§ 1915 and 1915A, and ruled that it failed to state a claim upon which relief could be granted. Plaintiff was allowed an opportunity to file an amended complaint. *See* Initial Review Order (Docket No. 7).

Plaintiff filed his Amended Prisoner Complaint on April 24, 2015, alleging claims of food deprivation, excessive use of force, and retaliation against Defendants Ada County, Deputy Martin Marquardt, and Deputy Mark Losh. *See* Am. Prisoner Compl. (Docket No. 9). This Court reviewed Plaintiff's Amended Prisoner Complaint and, on August 5, 2015, issued a second Review Order, permitting Plaintiff to proceed only on the food deprivation and excessive use of force claims and only against the individual Defendants. *See* Order (Docket No. 11).

**MEMORANDUM DECISION AND ORDER - 1**

On January 19, 2016, this Court granted the individual Defendants' Partial Motion to Dismiss, dismissing the food deprivation claim and dismissing Defendant Losh as a named defendant. Consequently, Plaintiff's claims have been distilled down to the excessive use of force claim against Defendant Marquardt, who now files the at-issue Motion for Summary Judgment.

## II. GENERAL FACTUAL BACKGROUND

This case arises from the undisputed use of force against former inmate William Fletcher by Deputy Marquardt at the Ada County Jail on the evening of August 7, 2013. According to Mr. Fletcher:

> Ada County Sheriff Deputy Marquardt harassed, slammed Plaintiff hard on floor face first, as Plaintiff was on ground in handcuffs – Ada County Sheriff Deputy Marquardt punched the Plaintiff in the lower spinal cord area of his back with hard object. Ada County Sheriff Deputy Marquardt choke Plaintiff with his forearm.

Am. Prisoner Compl., p. 2 (Docket No. 9).[1] Deputy Marquardt's account is unsurprisingly different, claiming that:

> Mr. Fletcher became argumentative with Deputy Marquardt after the deputy stopped and questioned him about suspicious movement on the tier. After stepping inside a nearby cell, Mr. Fletcher grew more verbally and physically aggressive. He then ignored instructions to face the wall and actively resisted the deputy's efforts to secure him. When Mr. Fletcher attempted to push off the wall towards Deputy Marquardt, the deputy delivered a leg strike to bring the inmate to the ground. Mr. Fletcher attempted to get up and out of the deputy's control. He continued to actively resist on the ground until Deputy Marquardt delivered a single strike with his fist to the inmate's right side. The deputy was then able to secure Mr. Fletcher in handcuffs and escort him out to a holder cell.

Mem. in Supp. of MSJ, p. 2 (Docket No. 64, Att. 1) (internal citations omitted). From this, Deputy Marquardt moves for summary judgment, arguing that he is entitled to summary judgment on the basis of qualified immunity.

---

[1] Plaintiff was a pretrial detainee in the Ada county Jail at the time of the events described in his Amended Prisoner Complaint. *See* Am. Prisoner Compl., p. 2 (Docket No. 9).

**MEMORANDUM DECISION AND ORDER - 2**

# III. STANDARDS

## A. Summary Judgment

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-34 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id*. at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id*. at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt unreasonable inferences from circumstantial evidence. *See McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to a material fact. *See Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support

the nonmoving party's case.  *See Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in his favor.  *See Devereaux*, 263 F.3d at 1076.  The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists.  *Celotex*, 477 U.S. at 324.

**B.     Qualified Immunity**

Even if a plaintiff is able to show a violation of a constitutional right under § 1983, a defendant may still be entitled to summary judgment on the basis of qualified immunity.  The doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate an inmate's clearly-established federal rights.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Conversely, a state official may be held personally liable in a § 1983 action if he knew or should have known that he was violating a plaintiff's clearly-established federal rights.  *See id*.  True to its dual purposes of protecting state actors who act in good faith and in allowing for the redress of clear wrongs caused by state actors, the qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quotation omitted).

A qualified immunity analysis consists of two prongs: (1) whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the [defendant's] conduct violated a constitutional right"; and (2) whether that right was clearly established.

*Saucier v. Katz*, 533 U.S. 194, 201 (2001); *C.B. v. City of Sonora*, 730 F.3d 816, 825 (9th Cir. 2013).[2] Qualified immunity operates to ensure that a government official is on notice that his conduct is unlawful, before he is subject to suit. *Pearson*, 555 U.S. at 244 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

To determine whether the right was clearly established, a court turns to Supreme Court and Ninth Circuit law existing at the time of the alleged act. *See Osolinski v. Kane*, 92 F.3d 934, 936 (9th Cir. 1996). In the absence of binding precedent, the district courts should look to available decisions of other circuits and district courts to ascertain whether the law is clearly established. *See id*.

The inquiry of whether a right was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. For the law to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand" that his conduct violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). It is not necessary that the "very action in question has previously been held unlawful," but "in the light of pre-existing law the unlawfulness must be apparent" to the official. *Id*. "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)); *see also Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) ("[E]xisting precedent must have placed the statutory or constitutional question beyond debate.") (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "This exacting

---

[2] Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

**MEMORANDUM DECISION AND ORDER - 5**

standard 'gives government officials breathing room to make reasonable but mistaken judgments.'" *City and Cnty. of San Francisco, Calif. v. Sheehan*, 135 S.Ct. 1765, 1774 (2015) (quoting *Ashcroft v. al-Kidd*, 131 S.Ct. 1765, 2085 (2011)).

Application of qualified immunity is appropriate where "the law did not put the [defendant] on notice that his conduct would be clearly unlawful." *Id*. However, "[i]f there is a genuine dispute as to the 'facts and circumstances within an officer's knowledge,' or 'what the officer and claimant did or failed to do,' summary judgment is inappropriate." *Moreno v. Idaho*, 2017 WL 1217113, *3 (D. Idaho 2017) (quoting *Act Up!/Portland v. Bagley*, 988 F.2d 868, 873 (9th Cir. 1993)). When a § 1983 defendant makes a properly supported motion for summary judgment based on qualified immunity, the plaintiff has the obligation to produce evidence of his own; the district court cannot simply assume the truth of the challenged factual allegations in the complaint. *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 963 (9th Cir. 2004)). That being said, the court must view the evidence in the light most favorable to plaintiff and resolve all material factual disputes in favor of plaintiff. *See Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003).

### IV. <u>DISCUSSION</u>

To prove an excessive force claim under § 1983, a pretrial detainee must show that the "force purposely used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473 (2015). A court (judge or jury) cannot apply this standard mechanically. *See id*. Rather, "objective reasonableness turns on the 'facts and circumstances of each particular case.'" *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight. *See Kingsley*, 135 S.Ct. at 2473.

**MEMORANDUM DECISION AND ORDER - 6**

A court "must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id*. (quoting *Bell v. Wolfish*, 441 U.S. 530, 540 (1979)) (alterations in original). Indeed, in such settings, the Supreme Court has stated in no uncertain terms:

> [T]he use of an objective standard adequately protects an officer who acts in good faith. We recognize that running a prison is an inordinately difficult undertaking, and that safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face. Officers facing disturbances are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving. For these reasons, we have stressed that a court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer. We have also explained that a court must take into account of the legitimate interest in managing a jail, acknowledging as part of the objective reasonableness analysis that deference to policies and practices needed to maintain order and institutional security is appropriate. And we have limited liability for excessive force to situations in which the use of force was the result of an intentional and knowing act (though we leave open the possibility of including a "reckless" act as well). Additionally, an officer enjoys qualified immunity and is not liable for excessive force unless he has violated a clearly established right, such that it would have been clear to a reasonable officer that his conduct was unlawful in the situation he confronted. It is unlikely (though theoretically possible)that a plaintiff could overcome these hurdles where an officer acted in good faith.

*Kingsley*, 135 S.Ct. at 2474-75 (internal quotation marks and citations omitted).

Factors that may bear on the reasonableness of the force used include "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id*. at 2473.

**MEMORANDUM DECISION AND ORDER - 7**

It is with these standards in mind that the Court must attempt to understand what took place between Mr. Fletcher and Deputy Marquardt on August 7, 2013; whether excessive force was employed; and whether qualified immunity applies. In that space, the parties' accounts of the incident diverge in nearly every respect.

To begin, during his deposition, Mr. Fletcher described his interaction with Deputy Marquardt as follows:

> Q: Where did he confront you actually on that tier? Where were you at?
>
> A: I was in the middle of the tier walking from 841. After I asked the guy for the cleaning supplies after he was done cleaning his cell.
>
> Q: And that was 841?
>
> A: Yes. As I was walking he stepped in front of my face.
>
> Q: Why did he do that?
>
> A: I don't know. I have no idea.
>
> Q: Did he say why he was stopping you?
>
> A: He stopped me and asked me why I was coming from down there. And I told him.
>
> Q: What did you tell him?
>
> A: I told him I was getting the cleaning supplies when he was done. Apparently he didn't like my attitude.
>
> Q: Why would he not like your attitude?
>
> A: Because we already had an altercation earlier that day.
>
> Q: Is it fair to say you were frustrated with him?
>
> A: No. I wasn't frustrated at all.
>
> Q: Why do you think he thought you had an attitude?

**MEMORANDUM DECISION AND ORDER - 8**

A: I don't know.

Q: How would you describe your demeanor?

A: I was just doing what I was told. I mean, when someone in authority steps in your face like that there has to be a significant reason for them to do it. And from there I felt like something bad was about to happen. And that is when he told me to step into someone else's cell.

Q: Did you raise your voice to him at that time?

A: No, I did not.

Q: Did you raise your arms or hands or anything like that?

A: No. I had clothes in my hand.

Q: You had clothes in your hand?

A: Yes, I did.

. . . .

Q: How was Deputy Marquardt's demeanor when he stopped you?

A: He was angry.

Q: Was he raising his voice at you?

A: Yes.

Q: Did he touch you in the tier way there?

A: Yeah. He grabbed my arm with his right hand. My left shoulder with his right hand telling me to go into 844. And that is with everybody on the tier just stepped back and just watched. There was no movement on the tier.

Q: Why was he moving you into that cell?

A: I have no idea. Away from the cameras, I guess.

Q: Was it in fact out of the cameras?

A: I don't know. I just felt threatened. I knew something was about to happen.

**MEMORANDUM DECISION AND ORDER - 9**

Q: There were other people on the tier, though, you say?

A: Yeah. A lot of people out. A lot of people in the dayroom. People on the tier. And they just stopped. They wasn't moving. They stopped and watched.

Q: That was as he was moving you into the cell?

A: No. When it first started they stopped and watched.

Q: What happened when you went into the cell?

A: He took me down to the ground.

Q: Nothing was said?

A: He asked me why I had an attitude. By the time I tried to explain I didn't have one he took me to the ground.

Q: Why would he ask you if you had an attitude?

A: I don't know. I have no idea. I get along with everybody. Didn't cause trouble. Nothing.

Q: Did he give you any instructions when you went into the cell?

A: No. I didn't hear no instruction. I know he grabbed my shoulder. Tell me to go in the cell. Asked me why I had an attitude. And the next thing I know I was on the ground.

Q: Did he at some point tell you to turn and face the wall before you went to the ground?

A: Did I what?

Q: Were you at some point turned to face the wall?

A: I don't remember.

Q: You don't remember that?

A: No.

Q: Were you argumentative at all?

**MEMORANDUM DECISION AND ORDER - 10**

A: What do you mean? I mean, when he throwed me to the ground I was yelling.

Q: Before that?

A: No.

Q: What were you yelling?

A: I told him he couldn't touch me like that. He was putting his hands on me unlawfully.

Q: I want to back up just a second. We'll get to the part where he took you to the ground here in a minute. When he stopped you – I want just to make sure we are clear on how it all started. It started in the tier; right?

A: Um-hmm.

Q: He stopped you and asked you where you were coming from?

A: Yes.

Q: What instructions did he give you at that point?

A: None.

Q: Why did you move into the cell?

A: Because he told me to.

Q: So when he told you to go in the cell did you cooperate?

A: Yes. I asked why am I going inside someone else's cell.

Q: What did he say?

A: That is when he asked me did I have an attitude when we was in there. And he slammed me to the ground.

Q: So there was no instructions to face the wall that you recall?

A: No.

Q: And did he attempt to face you towards the wall, that you recall?

**MEMORANDUM DECISION AND ORDER - 11**

A: No.

Q: Did you –

A: All that could have been avoided. Because he could have told me to go downstairs to the desk and talk to me. Ask me why did I come down from that way. It could have been all avoided. But since he was angry, like he was having a bad day, it escalated.

Q: How did [it] escalate?

A: Because he assaulted me.

Q: How did he take you down exactly?

A: Slammed me to the floor. I don't remember. I know I hit the floor hard. Knocked the wind out of me.

Q: You don't recall anything else –

A: No.

Q: – before hitting the ground?

A: No. I was just yelling trying to get everybody else's attention out there so they could see what was going on. Because I did not provoke him in any way.

Q: You were trying to get everybody's attention as he was taking you down?

A: Yeah. I was yelling for help.

Q: But you don't recall how he took you down?

A: He slammed me to the ground. He grabbed both of my arms and slammed me to the ground.

Q: And how did you land on the ground? On your chest?

A: Yes.

Q: Where was he?

A: On my back.

Q: Then what happened?

**MEMORANDUM DECISION AND ORDER - 12**

A: I yelled that I was going to sue. And that he was going to lose his job. And that is when he struck me in my lower back spine with a hard object and told me to shut up.

Q: Did you see the hard object?

A: No. I didn't pay any attention.

Q: How do you know it as a hard object?

A: Because I felt it in my spine.

Q: What did it fell like? Can you describe the object?

A: Something ball like shape.

Q: Like a ball?

A: Yes. Something like a ball hit me in my spine.

Q: So he took you down and you were yelling out that you were going to sue.

A: Yes.

Q: You said he struck you with –

A: That is when he struck me.

Q: In the spine?

A: Yes.

Q: Did you try to get up at all?

A: No. I wasn't moving. I couldn't move. He was on my back.

Q: Where were your hands?

A: He had my hands.

Q: How did he have your hands?

A: He had one in handcuffs. And when I said I was going to sue he struck me in the back and told me to shut up. And he called Deputy Losh upstairs. And by the time Deputy Losh got there he already had me handcuffed.

**MEMORANDUM DECISION AND ORDER - 13**

Q: So Deputy Losh got there pretty quickly?

A: Yes. Because he was down there talking to inmates.

Q: What happened after that?

A: I was picked up off the floor and taken down the stairs. At the bottom of the stair Deputy Marquardt turned me around and choked me with his forearm under my throat where I couldn't breathe. Choking me literally. And he dragged me out just like that. Both of them.

Q: Both Deputy Marquardt and Deputy Losh?

A: Yes. Deputy Losh had one arm. And Deputy Marquardt had me by my neck and shoulder.

Q: How were you walking?

A: I was backwards and they were walking forward.

Q: Could you breathe?

A: No. He was choking me. I told him I barely can breathe. And he wouldn't let go.

Q: Then what happened?

A: I was taken to the holding cell where I placed on the floor execution style.

Q: What does that mean?

A He told me to get on my knees. Get in the cell and get on my knees. And he slapped the handcuffs off and slammed the door.

. . . .

Q: When Deputy Marquardt stopped you it was right in front of that cell; right? Because he just moved you straight in there?

A: Yeah. I was right on this side of it.

Q: Of cell 844?

A: Yeah.

Q: So you were fairly close to the stairs?

**MEMORANDUM DECISION AND ORDER - 14**

A: Yeah. I was going downstairs to take a shower.

Q: Did you say "Get your hands off me" to Deputy Marquardt?

A: Yeah. Because he had no reason to put his hands on me.

Q: When did you say that?

A: When we was in the cell.

Q: So when you stepped into the cell you yelled at him?

A: No. When he grabbed me I told him to get his hands off me. And the next thing I know that is when I hit my chest.

Q: Anything else said by you or by him?

A: No. I was just yelling for help. Telling him I was going to sue him and he is going to lose his job. And that is when he hit me for making a verbal comment.

Q: Were you injured?

A: Yes.

Q: From that?

A: Yes.

Q: How so?

A: From which one? The chest pain? Or the back pain?

Q: Let's talk about all of it. You said he struck you. He threw you to the ground and struck you. What are your injuries from that?

A: My injuries are a migraine headache. I had bruised wrist that I asked to have pictures taken. And they wouldn't do it. And my lower spine. Paraspinosis (phonetic) in my spine. I don't know how to say it exactly. But I have it all written down.

Q: What else?

A: Migraine headaches. Bruised wrists. Chest pain. And I start freaking out. Paranoia. Every time I hear a door slam real hard I jump.

**MEMORANDUM DECISION AND ORDER - 15**

Fletcher Dep. at 66:1-67:15; 68:5-74:24; 79:4-80:21, attached as Ex. A to Chacko Aff. (Docket No. 64, Att. 3).

For his part, Deputy Marquardt recounts his confrontation with Mr. Fletcher quite differently, testifying in relevant part:

> At approximately 5:10 p.m., about 40 inmates were utilizing their out time, which enables them to leave their cells to access the common day room. They are instructed, however, not to move past their own cells to visit other cells. While walking a well-being check on the top right tier, I noticed inmate William Fletcher walking back from the direction of Cell 841. I knew at that time that Mr. Fletcher was assigned to Cell 845, so there would be no reason for him to pass by Cell 841 to access the day room stairwell. Thus, I stopped him to ask why he was coming from that direction. It did not appear that he wanted to answer and displayed an attitude about being questioned.
>
> Mr. Fletcher proceeded to walk close enough into my personal space to where I became uncomfortable. For my safety and his, I told Mr. Fletcher to back away from me. He complied, but became increasingly argumentative over my questioning.
>
> . . . .
>
> With a large number of inmates out of their cells at that time, I was concerned about Mr. Fletcher causing a disturbance. Inmates often act tough in front of other inmates. Allowing an inmate to argue shows weakness, threatening loss of control and increasing the risk that the situation will escalate or repeat. I was also concerned about the risk of other inmates coming up from behind. Because he continued to argue, I asked Mr. Fletcher to step inside a nearby cell to isolate him from the inmate movement on the tier. Separating argumentative inmates from their audience typically calms them down.
>
> In the cell, Mr. Fletcher began raising his arms while arguing with me in what I understood to be an aggressive manner. I then determined to secure Mr. Fletcher and to move him to a holder cell to cool off. I told him to turn and face the cell wall, but he ignored my directions. I went to place my left hand on his right shoulder to turn him towards the wall. When I did this, he pushed my hand away.
>
> I proceeded to secure Mr. Fletcher by placing my hands on his shoulders while turning him to the wall. While doing this, Mr. Fletcher actively resisted my movements by attempting to turn his body against me. At this time he began yelling, "Get your hands off me."

**MEMORANDUM DECISION AND ORDER - 16**

> Once Mr. Fletcher was facing the wall, he grew more resistant by attempting to push off of the wall towards my direction. Deputies are trained that subjects who actively resist should be immediately taken to the ground, to permit more effective control over the uncooperative subject. This led me to transition my body weight and to deliver a single leg strike to the back of his right leg to bring him to the ground.
>
> On the ground, Mr. Fletcher continued resisting and attempted to get up. I sought to secure his hands to handcuff him, but this only led to him using the opportunity to try to get up and out of my control. I could not get to my radio, so I shouted out to Deputy Losh for assistance.
>
> Mr. Fletcher continued to struggle to move out of my control, ignoring my commands to stop resisting. I positioned my left arm under his neck and again told him to stop resisting. He continued to resist, so I delivered a single strike to his right side with my fist. Mr. Fletcher immediately stopped resisting and I was then able to transition him to handcuffs. He remained very vocal throughout, saying, "I am going to sue you" and "You're going to lose your job for this."
>
> Deputy Losh arrived just as I finally secured Mr. Fletcher. Team support arrived soon after and secured the area. Deputy Losh and I lifted Mr. Fletcher to his feet so we could escort him to the small holder cell in CCU.
>
> As we escorted him out, Mr. Fletcher attempted to pull away from our hold. For increased control, we walked him out backwards with my right hand on the side of his head in order to prevent him from spitting.
>
> Once in the small holder, Mr. Fletcher complied with orders to kneel in the corner while we removed his shoes and searched him for any contraband. Deputy Losh then removed his handcuffs through the utility port.
>
> I did not then, or anytime thereafter, observe any physical injuries on Mr. Fletcher. In an abundance of caution, I notified medical of he incident and Nurse Farmer came down to evaluate Mr. Fletcher in the holder cell. Mr. Fletcher told the nurse that he had no injuries.

Marquardt Aff. at ¶¶ 3-4, 6-15 (Docket No. 64, Att. 11).

There are no other first-hand descriptions of what did – or did not – take place in the moments surrounding the row between Mr. Fletcher and Deputy Marquardt which would help

**MEMORANDUM DECISION AND ORDER - 17**

resolve the discrepancy between the parties' above-referenced statements.³ Furthermore, videos of Cell Block 8 (from two opposing vantage points) during the relevant time frame are less useful than one might expect. While the videos clearly show the moment that Deputy Marquardt and Mr. Fletcher cross paths, the view is obstructed once Mr. Fletcher is inside the cell (Cell 844), the location where the events giving rise to Mr. Fletcher's claims – and Deputy Marquardt's defenses – occurred.⁴ These realities reflect a classic "he-said-he-said" situation of

---

³ Deputy Losh is only able to add that:

> I heard Deputy Marquardt calling out for my assistance and immediately ran up the stairwell. I arrived to his location, finding inmate William Fletcher positioned face down on the ground, with Deputy Marquardt kneeling over him.
>
> Mr. Fletcher was very vocal and appeared to be actively resisting Deputy Marquardt's attempts to secure him in handcuffs. Just as I was arriving, I observed Deputy Marquardt deliver a short jab to the inmate's side. Mr. Fletcher then stopped resisting and he was placed into handcuffs.
>
> Team support arrived soon after and secured the area. I assisted Deputy Marquardt in lifting Mr. Fletcher to his feet and we proceeded to escort him out to a holder cell. We walked him out backwards to maintain better control of the inmate.

Losh Aff. at ¶¶ 4-6 (Docket No. 65).

⁴ Both videos have been reviewed multiple times and, even though the particulars of what took place between Mr. Fletcher and Deputy Marquardt in Cell 844 are not evident, it nonetheless appears that certain statements made (from both parties) during the subsequent investigatory/disciplinary process are not entirely accurate. For example, Deputy Marquardt testified in his deposition that Mr. Fletcher was "escorted to the floor." *See* Ex. B to Shepherd Aff. at p. 64 of 69 (Docket No. 64, Att. 9). The video evidences, however, an unquestionable physical altercation between Deputy Marquardt and Mr. Fletcher and that force was used to bring Mr. Fletcher to the ground. It is an understatement at best and a misstatement otherwise, to say, simply, that Mr. Fletcher was "escorted to the ground." Similarly, Mr. Fletcher's statement that Deputy Marquardt "forced" him into Cell 844 is an overstatement as the videos seem to reflect Mr. Fletcher walking into Cell 844 on his own (albeit likely in response to Deputy Marquardt's request). *See* Ex. C to Shepherd Aff. at p. 65 of 69 (Docket No. 64, Att. 9); *see also* Fletcher Dep. at 70:23-71:3, attached as Ex. A to Chacko Aff. (Docket No. 64, Att. 3).

**MEMORANDUM DECISION AND ORDER - 18**

opposing narratives incapable of resolution as a matter of law, especially when the evidence must be viewed in Mr. Fletcher's favor as the non-moving party. *See supra*. In a similar setting, this Court recently stated as much in *McDowell v. Jefferson Co.*, 2017 WL 241319 (D. Idaho 2017). There, Chief U.S. District Judge B. Lynn Winmill denied the defendants' motion for summary judgment on the issue of qualified immunity for excessive force, reasoning:

> Here, the video appears to show that McDowell (1) was continuing to be verbally abusive, and (2) was not complying with the officers' demand to get down on the ground. What is not clear is the extent to which McDowell was physically resisting the officers' attempt to place handcuffs on him, given that all facts must be construed in favor of McDowell. It is also unclear whether the Taser was needed to ensure compliance. Moreover, the legality of the arrest remains to be resolved. For these reasons, the Court cannot find that the officers have, as a matter of law, qualified immunity from the excessive force allegations. Accordingly, the Court will deny this portion of the motion.

*Id*. at *5. This same rationale applies here – owing to the disputed material facts that necessarily exist when trying to understand what took place between Mr. Fletcher and Deputy Marquardt in Cell 844, it cannot be said as a matter of law that either (1) no excessive use of force took place, or (2) if so, Deputy Marquardt is entitled to qualified immunity. Construing such disputed facts in Mr. Fletcher's favor, as must be done in this motion context, a jury could believe that Deputy Marquardt used excessive force in violation of a constitutional right that was clearly established. Because such a finding is possible, summary judgment is inappropriate.

There are unique circumstances presented in a sometimes-violent prison environment and in regard to the course of conduct that must reasonably be employed to safely address and/or prevent disruptions. However, the fact of such circumstances also is not tantamount in all instances to an after-the-fact justification for the excessive use of force in such settings. This Decision *does not conclude* that Deputy Marquardt used excessive force or that Deputy

**MEMORANDUM DECISION AND ORDER - 19**

Marquardt is not entitled to qualified immunity.  Additionally, this Decision *takes no position* on the ultimate merits of Mr. Fletcher's remaining claim against Deputy Marquardt.  Instead, this Decision identifies material and disputed issues of fact that preclude the entry of summary judgment in Deputy Marquardt's favor.  Resolution of these issues is appropriately left to the trier-of-fact, the jury.

## V.  ORDER

Based upon the foregoing, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment (Docket No. 64) is DENIED.



DATED:  **September 27, 2017**

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge